UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| DIRECT ENTERPRISES, INC., | ) | |
| OLYMPUS SEED TREATMENT | ) | |
| FORMULATOR, INC., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 1:15-cv-01333-JMS-TAB |
| | ) | |
| SENSIENT COLORS LLC, | ) | |
| SPECTRA COLORANTS, INC., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| SENSIENT COLORS LLC, | ) | |
| | ) | |
| Third Party Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SPECTRA COLORANTS, INC., | ) | |
| | ) | |
| Third Party Defendant. | ) | |

## ORDER

Plaintiffs Direct Enterprises, Inc. ("DEI") and Olympus Seed Treatment Formulator, Inc. ("Olympus") (collectively "Plaintiffs") are companies that specialize in blending and selling treatment mixtures for seeds. Defendant and Third Party Plaintiff Sensient Colors LLC ("Sensient") sells colorants that are used as additives in seed treatment blends, and Defendant and Third Party Defendant Spectra Colorants, Inc. ("Spectra") manufactures colorants. This matter arises from a dispute among the parties regarding a batch of allegedly defective colorants that Plaintiffs purchased from Sensient. Plaintiffs filed suit in this Court, alleging various causes of action against Sensient and Spectra. Following their initial complaint, Plaintiffs filed several amended complaints over the next eighteen months, with the operative Third Amended Complaint

1

filed in February 2017. [Filing No. 95.] Sensient and Spectra have filed Motions to Dismiss the Third Amended Complaint, arguing that Plaintiffs have failed to state a claim upon which relief may be granted. [Filing No. 96; Filing No. 100.] For the reasons below, the Court denies Sensient's Motion to Dismiss and grants Spectra's Motion to Dismiss.

# I.
## LEGAL STANDARD

Federal Rule of Civil Procedure 8(a)(2) "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (quoting Fed. R. Civ. Pro. 8(a)(2)). "Specific facts are not necessary, the statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Erickson*, 551 U.S. at 93 (quoting *Bell Atlantic v. Twombly*, 550 U.S. 544, 555 (2007)).

A motion to dismiss asks whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). In reviewing the sufficiency of a complaint, the Court must accept all well-pled facts as true and draw all permissible inferences in favor of the plaintiff. *See Active Disposal, Inc. v. City of Darien*, 635 F.3d 883, 886 (7th Cir. 2011). The Court will not accept legal conclusions or conclusory allegations as sufficient to state a claim for relief. *See McCauley v. City of Chicago*, 671 F.3d 611, 617 (7th Cir. 2011). Factual allegations must plausibly state an entitlement to relief "to a degree that rises above the speculative level." *Munson v. Gaetz*, 673 F.3d 630, 633 (7th Cir. 2012). This plausibility determination is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

## II.
### BACKGROUND

DEI is a marketer and distributor of farming inputs and agricultural products, including agricultural seed treatments. [Filing No. 95 at 2.] DEI formulates and sells seed treatments for application to agricultural seed such as corn, wheat, and soybeans. [Filing No. 95 at 2.] The applicable federal regulatory regime requires that seeds that are treated with compounds that are poisonous to humans and animals be colored, so persons handling the seed are aware of the nature of the treatment. [Filing No. 95 at 3.] Several of DEI's seed treatments contain pesticides and fungicides, including some compounds that have a degree of toxicity to humans and animals. [Filing No. 95 at 3.]

Sensient is a manufacturer and supplier of colorants, which are promoted by Sensient for use in food, pharmaceutical, and industrial applications. [Filing No. 95 at 2.] In early December 2011, Sensient promoted the use of its colorants at a trade show attended by Dennis Tauchen, one of the principals of DEI. [Filing No. 95 at 3.] Keith Brewer, a sales account manager for Sensient, promoted Sensient's colorants for the coloring of chemically treated seeds. [Filing No. 95 at 3.] Brewer "touted to Tauchen Sensient's experience in the seed industry, and the superiority of its colorants for use in agricultural seed applications." [Filing No. 95 at 3.] After the trade show, Brewer continued to solicit DEI for its colorant business. [Filing No. 95 at 3.] Brewer represented to Don Bradley, a DEI consultant, that Sensient manufactured colorants using only EPA-approved ingredients, and that Sensient produced a colorant that gives a pearlescent effect to treated seed. [Filing No. 95 at 3.]

As a result of these solicitations, Brewer, Tauchen, and Bradley began emailing one another regarding potential purchases of colorant, polymers, and custom colorants. [Filing No. 95 at 4.] Brewer represented that Sensient manufactured a line of standard colorants under the name

"Sensi-Coat" and a premium colorant that created a pearlescent effect. [Filing No. 95 at 4.] In December 2011, DEI emailed Brewer descriptions of its basic seed treatment blends and how Sensient's colorants would be used in the blends. [Filing No. 95 at 4.] On or around December 20, 2011, Brewer emailed DEI copies of its product labels, data sheets, and material safety data sheets for the Sensi-Coat red colorant. [Filing No. 95 at 4.] Around the same date, Brewer emailed the following representations about Sensient's pearlescent red colorant, "Sensi-Coat Red Pearlescent": (1) "Sensi Coat Red Pearlescent (SCP) uses the same pigment as [Sensi Coat Red]"; (2) "Usage rates are the same for [Sensi-Coat Red and Sensi-Coat Red Pearlescent]."

The parties continued to communicate regarding price quotes, products, and a non-disclosure agreement. [Filing No. 95 at 5.] On or around January 31, 2012, Brewer traveled to Indiana to meet with DEI. [Filing No. 95 at 5.] During that visit, Brewer represented that Sensient developed and tested its colorants and polymers in Sensient's lab. [Filing No. 95 at 5.] In January and February 2012, Sensient provided DEI with small samples of Sensi-Coat Red, Sensi-Coat Blue, Sensi-Coat Green, and Sensi-Coat Red Pearl for evaluation and small-scale seed treatment trials. [Filing No. 95 at 6.] Using those samples, DEI made small batches of seed treatment blends to evaluate compatibility with the blend components, the appearance of the colorant when applied to seed, and whether the colorant would have any adverse effect on germination. [Filing No. 95 at 6.] Tauchen and Bradley relayed the results of those sample evaluations to Brewer, and Brewer made several follow-up visits to DEI's facilities to observe the seed treatment operation and to personally view the evaluations conducted by DEI. [Filing No. 95 at 6.] The only instructions that Sensient provided during the evaluation of the colorants consisted of usage rates. [Filing No. 95 at 7.]

In February 2012, the principals of DEI formed a new company, Olympus, to become the seed treatment division of DEI and to establish an outside market for the custom seed blends. [Filing No. 95 at 6.] Sensient, via Brewer, was informed about the creation of Olympus and was informed that Olympus would make the blends and sell seed treatments to DEI and DEI's customers. [Filing No. 95 at 7.] Brewer regarded DEI and Olympus as a single customer, with the express understanding that DEI would be the primary beneficiary of treatment blends made by Olympus. [Filing No. 95 at 7.]

Based on the various written and oral representations from Brewer, as well as DEI's and Olympus' review of information publicly available about Sensient, DEI and Olympus decided to purchase Sensient's colorants for use in their seed treatment blends. [Filing No. 95 at 7-8.] Tauchen emailed Brewer Olympus' first purchase order on or about May 27, 2012. [Filing No. 95 at 8.] Brewer emailed his receipt and acceptance of the order within a few days, and he did not communicate any additional terms. [Filing No. 95 at 8.] In that email, Brewer indicated that Sensient would produce the colorant for Olympus and DEI. [Filing No. 95 at 8.] Plaintiffs' understanding is that Sensient filled this order with Sensi-Coat Red. [Filing No. 95 at 8.] Following this initial order, Brewer, Tauchen, and Bradley continued to communicate by email regarding future orders of Sensient's colorants, polymers, and other products. [Filing No. 95 at 8.] These discussions formed the basis of Olympus' future purchase orders. [Filing No. 95 at 8-9.] From July 2012 through November 2013, Tauchen emailed four more purchase orders to Brewer, which Brewer accepted. [Filing No. 95 at 9.]

In the fall of 2012, Brewer inquired again about Plaintiffs' continued interest in Sensi-Coat Red Pearl, and offered to provide an updated price quote. [Filing No. 95 at 9.] Tauchen responded that he would be willing to order red, green, and blue in the pearlescent format, depending on

Sensient's pricing. [Filing No. 95 at 10.] Thereafter, Brewer emailed an updated price for the pearlescent colors and sent samples of Sensi-Coat Blue Pearl and Sensi-Coat Green Pearl for evaluation. [Filing No. 95 at 10.] Brewer represented that those colors should mimic Sensi-Coat Red Pearl. [Filing No. 95 at 10.] On October 8, 2012, Brewer emailed Tauchen to request that Olympus' Purchase Order #114 be amended to switch from Sensi-Coat Red to Sensi-Coat Red Pearl at a higher price, and Tauchen agreed. [Filing No. 95 at 10.] Brewer also switched the other colorants remaining in that purchase order (blue and green) from standard colorants to Sensi-Coat Green Pearl and Sensi-Coat Blue Pearl. [Filing No. 95 at 10.]

In November 2012, Tauchen emailed Brewer Purchase Order #139 requesting Sensi-Coat Red Pearl. [Filing No. 95 at 10.] In December 2012, Sensient shipped red, blue, and green pearlescent colorants to complete the remaining portion of Purchase Order #114 and to fill Purchase Order #139. [Filing No. 95 at 10.] Olympus used those pearlescent colorants to make seed treatment blends for the upcoming soybean season. [Filing No. 95 at 10.] Olympus then sold those treatment blends to a direct customer and to DEI, which in turn sold those blends to its customers. [Filing No. 95 at 10.] Plaintiffs' customers began to report that the drums containing the blends had a thick sludge on the bottom, and that the sludge was plugging up their treating equipment. [Filing No. 95 at 11.] In many instances, the seed treatments became so thick that they could not be used to treat seed. [Filing No. 95 at 11.] Some customers also reported that drums were swelling with an accumulation of gases. [Filing No. 95 at 11.] The majority of customer complaints concerned treatments containing Sensient's red colorant, although a small number concerned the blue and green colorants. [Filing No. 95 at 11.]

DEI and Olympus promptly investigated these complaints, and sent teams to try to re-work the treatments to make them usable. [Filing No. 95 at 11.] While investigating, Plaintiffs came to

believe that Sensient's colorants were causing the problems observed in the treatments, and they promptly notified Sensient of the issues. [Filing No. 95 at 11.] Plaintiffs offered numerous samples of the problematic mixtures to Sensient for investigation, and they also sent Sensient samples for testing. [Filing No. 95 at 11.] Sensient was informed that DEI and Olympus were incurring significant losses due to seed treatment blends being destroyed and becoming unusable by customers. [Filing No. 95 at 11.] Bradley notified Brewer that DEI and Olympus would not be able to continue using Sensient's pearlescent colorants due to their instability, tendency to settle, and high ammonia content. [Filing No. 95 at 11.] Bradley requested that Sensient take back the unopened inventory of colorants, consisting of pre-packaged 2.5-gallon jugs of red, green, and blue pearlescent colorants. [Filing No. 95 at 12.]

As these communications were occurring, Plaintiffs did not know that Sensient was not the manufacturer of any of the products that it sold to Plaintiffs. [Filing No. 95 at 12.] Spectra was the actual manufacturer. [Filing No. 95 at 12.] On or around October 1, 2013, Gary Wulf, the vice-president of Spectra, admitted to Sensient that it made a mistake in producing the red pearl colorant. [Filing No. 95 at 12.] Wulf stated that instead of 27 pounds of ammonia, Spectra added 270 pounds of ammonia to red pearl lot number 22121010. [Filing No. 95 at 12-13.] On or around October 23, 2013, Brewer emailed Plaintiffs that Sensient had identified a "crucial problem" and admitted that one lot of Sensi-Coat Red Pearl was overloaded by a factor of ten with ammonium hydroxide. [Filing No. 95 at 12.] Brewer assured Plaintiffs that Sensient would make them whole and repair the problem. [Filing No. 95 at 12.]

In the following months, Plaintiffs provided information regarding the destroyed treatments and the financial losses they accrued. [Filing No. 95 at 12.] Sensient ultimately informed Plaintiffs by letter that it was not the manufacturer or developer of the colorants on April

29, 2014.  [Filing No. 95 at 13.]  Sensient stated that "Sensient did not manufacture the colorant provided to your client, but rather obtained this material directly from or [sic] supplier, Spectra Colorants, Inc., and resold it to DEI under a Sensient label.  In spite of this deviation, the colorant continued to meet all specifications and [DEI] accepted and proceeded to use the colorant in its seed treatment blends."  [Filing No. 95 at 13.]  Plaintiffs understood this response to be a rejection of their previous efforts to substantiate their losses, and communication between the parties ended. [Filing No. 95 at 13.]

Plaintiffs filed their initial Complaint against Sensient in this Court on August 24, 2015, [Filing No. 1], followed by Amended and Second Amended Complaints, [Filing No. 9; Filing No. 23].  Plaintiffs filed the operative Third Amended Complaint, also naming Spectra as a defendant, on February 18, 2017.[1]  [Filing No. 95.]  Plaintiffs allege claims for fraud and constructive fraud; breach of contract; breach of express warranty; breach of the implied warranty of merchantability; breach of the implied warranty of fitness for a particular purpose; and violation of the Indiana Products Liability Act ("IPLA"). [Filing No. 95 at 21.]     Presently pending before the Court are Motions to Dismiss filed by Sensient, [Filing No. 96] and Spectra, [Filing No. 100].  Those motions are now ripe for the Court's review.

### III.
### DISCUSSION

#### A. Sensient's Motion to Dismiss

Sensient moves to dismiss four of Plaintiffs' six claims—fraud and constructive fraud; breach of contract; breach of express warranty; and violation of the IPLA.  Sensient also moves to dismiss DEI as a plaintiff.  The Court considers each claim in turn.

---

[1] Sensient had already filed its Third-Party Complaint against Spectra on June 10, 2016.  [Filing No. 44.]

*1. Fraud and Constructive Fraud*

Sensient argues that Plaintiffs fail to plead all of the required elements to establish fraud, particularly under the heightened pleading standard of Federal Rule of Civil Procedure 9(b). [Filing No. 97 at 10.] Specifically, Sensient contends that Plaintiffs fail to allege scienter—that Sensient made a representation with knowledge or reckless ignorance of the statement's falsity. [Filing No. 97 at 10.] As for constructive fraud, Sensient argues that Plaintiffs have not adequately pleaded the first required element—that Sensient had a duty to disclose certain material information. [Filing No. 97.] Plaintiffs respond that they have adequately pleaded all of the required elements to maintain a claim for fraud and constructive fraud. [Filing No. 105 at 9-11.]

Under Indiana law, fraud consists of six elements: "(1) a material misrepresentation of past or existing fact which (2) was untrue, (3) was made with knowledge of or in reckless ignorance of its falsity, (4) was made with the intent to deceive, (5) was rightfully relied upon by the complaining party, and (6) which proximately caused the injury or damage complained of." *Kesling v. Hubler Nissan, Inc.*, 997 N.E.2d 327, 335 (Ind. 2013). "Fraud may be proven by circumstantial evidence, provided there are facts from which the existence of all of the elements can be reasonably inferred." *Wright v. Pennamped*, 657 N.E.2d 1223, 1230 (Ind. Ct. App. 1995), *decision clarified on denial of reh'g*, 664 N.E.2d 394 (Ind. Ct. App. 1996).

 Sensient contends that Plaintiffs' Amended Complaint "does not address scienter with respect to the ten allegedly false representations" identified. [Filing No. 97 at 11.] Sensient argues that "[a]t most, the allegations suggest Plaintiffs were simply (and unfortunately) confused by the different attributions of the Pearl and non-Pearl." [Filing No. 97 at 11.] This characterization of Plaintiffs' Amended Complaint, however, ignores a host of allegations regarding the fraud claim. For example, Plaintiffs allege that Sensient made representations that it developed and

manufactured the colorants and polymers sold to Plaintiffs, when in fact Spectra was the actual manufacturer.  [Filing No. 95 at 4-7; Filing No. 95 at 13.]  While Plaintiffs may not specifically allege that Sensient had scienter as to Spectra's role, the Court may reasonably infer that Sensient knew who manufactured the products it sold, given the relationship between Spectra and Sensient. Accordingly, Plaintiffs have sufficiently pleaded their fraud claim.

As to constructive fraud, Sensient argues that it "did not have the duty to disclose and explain to Plaintiffs the minutia identified as misrepresentations."  [Filing No. 97 at 11.]  Under Indiana law, constructive fraud consists of: (1) a duty existing by virtue of the relationship between the parties; (2) representations or omissions made in violation of that duty; (3) reliance thereon by the complaining party; (4) injury to the complaining party as a proximate result thereof; and (5) the gaining of an advantage by the party to be charged at the expense of the complaining party. *Wells v. Stone City Bank*, 691 N.E.2d 1246, 1250-51 (Ind. Ct. App. 1998).  Regarding the first element, the duty owed between the parties, constructive fraud may arise when the relationship between the parties is one of buyer and seller.  *Mullen v. Cogdell*, 643 N.E.2d 390, 401 (Ind. Ct. App. 1994) ("where a seller makes unqualified statements in order to induce another to make a purchase, the buyer relies on those statements, and the seller has professed knowledge of the truth of the statements, a constructive fraud occurs").  "The law recognizes that in a buyer-seller relationship one party may be in the unique position of knowledge not possessed by the other and may thereby enjoy a position of superiority over the other.  The relationship is therefore one which invokes the duty of good faith and fair dealing."  *Id.*

Sensient challenges the first required element, arguing that no duty was created, because Brewer, "a mere salesman," did not have skills or expertise regarding seed treatments or pearlescent colorants that were "superior to" those of Plaintiffs, who were "actually in the seed

treatment business." [Filing No. 97 at 12.] This argument fails. Brewer need not have special skills or expertise for a duty to be imposed; it is sufficient that he allegedly possessed information not known to Plaintiffs—*i.e.*, the actual manufacturer of the products. *See Mullen*, 643 N.E.2d at 401. Taking as true the Third Amended Complaint's allegations, Sensient alone had knowledge of who was actually developing and manufacturing its products. That put Sensient in a superior position to Plaintiffs, who received only Sensient's representations that it manufactured the subject products. This is sufficient to maintain the first element of a constructive fraud claim.

Sensient argues in the alternative that the Court should dismiss any fraud or constructive fraud claims based on statements that are "expressions of opinion." [Filing No. 97 at 13.] Sensient takes issue with the following statements:

- "[T]he colorants and polymers sold by Sensient were used 'extensively' in the seed industry";

- "[T]he colorants would provide 'better' coating properties than dyes";

- "[T]he components of the colorants were 'widely' used";

- "[T]he Pearl was a 'premium' product that would perform 'very well'";

- "Sensient was 'capable' of providing tech support for its colorants";

- "[T]he polymers sold by Sensient would 'ensure' the active ingredients would stay on the seeds."

[Filing No. 97 at 13.]

Under Indiana law, statements of opinion generally may not provide the basis for a fraud claim. *Kesling*, 997 N.E.2d at 336 ("Mere 'puffing' is a statement of opinion, not a representation of fact, and thus cannot be the basis of deception or fraud claims."); *see also Reed v. Reid*, 980 N.E.2d 277, 292 (Ind. 2012). Most of the statements identified by Sensient, however, are not

statements of opinion, but rather statements of fact. The following four statements make factual representations:

- "[T]he colorants and polymers sold by Sensient were used 'extensively' in the seed industry";

- "[T]he components of the colorants were 'widely' used";

- "Sensient was 'capable' of providing tech support for its colorants";

- "[T]he polymers sold by Sensient would 'ensure' the active ingredients would stay on the seeds."

[Filing No. 97 at 13.] While several of those statements are phrased in terms of degree—"used extensively" or "widely used"—they make representations about the state of the world that are measurable and verifiable. Those are statements of fact.

The following statements, however, read more like opinions:[2]

- "[T]he Pearl was a 'premium' product that would perform 'very well'";

- "[T]he colorants would provide 'better' coating properties than dyes."

[Filing No. 97 at 13.] The Court notes, however, that these statements, apart from whether they could provide a standalone basis for a fraud claim, could also constitute support for Plaintiffs' claims regarding Sensient's alleged misrepresentations about the true manufacturer of the product. To the extent that Plaintiffs seek to use these alleged statements to support a claim regarding what Sensient knew or could have known about the products' testing or performance, if it was not the manufacturer, these statements are relevant to Plaintiffs' claims. The Court concludes that

---

[2] The Court notes that the line between fact and opinion is often one of degree. *See Comfax Corp. v. N. Am. Van Lines, Inc.*, 638 N.E.2d 476, 484 (Ind. Ct. App. 1994) (discussing the fact versus opinion question in the context of admissible evidence).

dismissal as to these allegations, on the basis that they (as a matter of law) constitute puffery, would be premature.

Finally, Sensient argues that the allegations contained in the Third Amended Complaint do not meet the heightened pleading standard imposed by Federal Rule of Civil Procedure 9(b).  Rule 9 requires that "in alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9.  Sensient contends that "[t]he Complaint suggests that Brewer sent emails misrepresenting the market penetration of the Pearl, but the dates and recipients of those emails are not provided."  [Filing No. 97 at 15.]  Citing *Hefferman v. Bass*, 467 F.3d 596, 601-02 (7th Cir. 2006), Sensient argues that Plaintiffs' Third Amended Complaint falls short of the Rule 9 requirement that Plaintiffs plead "facts such as the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation…" [Filing No. 97 at 15.]  Plaintiffs respond that they have pleaded with particularity the alleged misrepresentations, identifying the content, speaker, and specific email correspondence in which the statements occurred.  [Filing No. 105 at 10-11.]

The Court concludes that Plaintiffs have alleged the relevant facts with sufficient particularity to satisfy the requirements of Rule 9.  First, in the portions of the Third Amended Complaint cited by Sensient, Plaintiffs specify that multiple emails were exchanged between Tauchen, Bradley, and Brewer from December 2011 through January 2012 regarding Sensient's (and specifically Brewer's) representations regarding Sensient's products.  [Filing No. 95 at 4.]  Plaintiffs provide specific dates regarding many, but not all, of those emails.  [Filing No. 95 at 4.]  While Plaintiffs do not allege all of the specific email dates, this level of particularity is sufficient to satisfy Rule 9.  *See Hefferman*, 467 F.3d at 602 (concluding that an allegation that event occurred "some time in late August or early September" 2003 "late at night—it was after midnight" was

sufficient to satisfy Rule 9). While the Complaint does not specify whether Tauchen, Bradley, or both were the listed recipients of the subject emails (or perhaps the recipient was a general "DEI" or "Olympus" email address), the Complaint alleges the timing and parties with sufficient specificity to satisfy Rule 9.

For the reasons described above, the Court concludes that Plaintiffs have adequately pleaded their claims for fraud and constructive fraud, and Sensient's motion to dismiss those claims is denied.

### 2. Breach of Express Warranty

Sensient argues that the Court should dismiss Plaintiffs' claim for breach of express warranty, contending that the Third Amended Complaint does not "identify specific warranties made by Sensient with respect to quality, suitability, or compatibility of the [pearlescent colorant]." [Filing No. 97 at 6.] Sensient also contends that Plaintiffs do not adequately plead a breach of express warranty based on Sensient's provision of samples, because "the Complaint fails to allege non-conformity" between the samples provided and the allegedly nonconforming goods later delivered. [Filing No. 97 at 7.] Plaintiffs respond by pointing to a series of statements that they argue constitute descriptions of and promises about Sensient's products. [Filing No. 105 at 7-8.] They also point out several allegations identifying nonconformities between the samples and products as delivered. [Filing No. 105 at 8.]

Under Indiana law, express warranties may be created by a seller by (1) any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain; (2) any description of the goods which is made part of the basis of the bargain; or (3) any sample or model which is made part of the basis of the bargain. *Belden Inc. v. Am. Elec. Components, Inc.*, 885 N.E.2d 751, 762 (Ind. Ct. App. 2008). "It is not necessary to the creation

of an express warranty that the seller use formal words such as 'warrant' or 'guarantee' or that he have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty." *Id.* Moreover, "[p]ast deliveries may set the description of quality, either expressly or impliedly by course of dealing." *Id.* In opposing Sensient's Motion to Dismiss, Plaintiffs identify allegations within all three categories of express warranties.

First, as to descriptions of the goods, Plaintiffs identify the following relevant statements from their Third Amended Complaint:

- "the standard and pearlescent colorants use the same pigments";

- "usage rates are the same for standard and pearlescent pigments";

- "The pearlescent colorants contain both mica and titanium dioxide additives";

- "Plaintiffs the colorants [sic] were also described on Sensient's web site."

[Filing No. 105 at 7.] As for the representation that the standard and pearlescent colors use the same pigment, while the Complaint is not entirely clear, it appears that Plaintiffs allege that the pigments were not actually the same:

> On or around August 22, 2012 … [Brewer] made the following representation: 'Your waldo comment reminded me of one KEY comment I didn't provide … The Sensi Coat Pigments are completely different chemistries compared to Dave's. Our EPA complaint colorants are Pigments that are milled, providing much better coating properties as compared to Dave's liquid dyes.'

[Filing No. 95 at 9.] Regarding the statement that "usage rates are the same for standard and pearlescent pigments," Plaintiffs allege that at least some of the pearlescent colorant could not be used at all, because it became too thick to apply to seed. [Filing No. 95 at 11.] Construing the Third Amended Complaint in the light most favorable to Plaintiffs, this could constitute an allegation that the pearlescent colors did not conform to the representation made by Sensient. As

for the remaining two statements identified by Plaintiffs, the Court sees no allegation in the Complaint that the pearlescent colorants did not contain both mica and titanium dioxide. And the Court is not entirely clear what the fourth statement alleges. Plaintiffs have, however, sufficiently alleged non-conforming descriptions to survive a motion to dismiss.

Second, Plaintiffs identify the following promises made by Sensient about the goods:

- "the pearlescent colorant will perform on corn, wheat, and soybeans";

- "The colorants were EPA-compliant";

- "The pearlescent colorants were in active use by canola and beet seed companies";

- "The colorants were tested on soybeans."

[Filing No. 105 at 7-8.]

Reading the complaint in the light most favorable to Plaintiffs, the Court concludes that the Third Amended Complaint contains allegations that could plausibly be read as alleging that the goods did not conform to these promises. Plaintiffs allege that at least some of the pearlescent colorants would not perform on corn, wheat, and soybeans, because the seed treatment mixtures containing them could not be effectively applied to seed. [Filing No. 95 at 11.] They allege that one batch of pearlescent color had ten times the requisite amount of ammonia. [Filing No. 95 at 12-13.] It is a reasonable inference that this could have resulted in a treatment mixture that was no longer EPA-compliant. Plaintiffs allege that the pearlescent colorants had never been successfully employed in any seed treatments, [Filing No. 95 at 16], contrary to Sensient's representation that they were in active use by canola and beet seed companies. And Plaintiffs allege that Sensient in fact never tested the colorants on soybeans, because the products were instead tested and manufactured by Spectra, [Filing No. 95 at 16].

And third, Plaintiffs address Sensient's argument that Plaintiffs have not adequately pleaded a claim based on the provision of samples, because "the Complaint fails to allege non-conformity" between the samples provided and the allegedly nonconforming goods later delivered. [Filing No. 97 at 7.] Plaintiffs allege in their Third Amended Complaint that "[u]sing samples provided by Sensient, DEI made small batches of seed treatment blends to evaluate the compatibility with the blend components, the appearance of colorant when applied to seed, and whether the colorant would have any adverse effect on seed germination." [Filing No. 95 at 6.] Plaintiffs also allege that DEI "shared the results of its evaluations of the Sensient polymer samples with Brewer," and that Brewer visited Plaintiffs in Indiana to view the testing for himself. [Filing No. 95 at 6.] While Plaintiffs do not specifically allege that the samples did not exhibit the "problematic" qualities observed later in the treatment blends, the Court may reasonably infer from the Third Amended Complaint's allegations (and the fact that Plaintiffs chose to purchase Sensient's products) that the samples did not develop a "thick sludge" or swell with an accumulation of gases.

Because Plaintiffs have adequately pleaded the required elements of a claim for breach of an express warranty, the Court denies Sensient's motion to dismiss this claim.

### 3. Breach of Contract

Sensient argues that the Court should dismiss Plaintiffs' breach of contract claim, because only breach of warranty claims—not breach of contract claims—are available under the Uniform Commercial Code ("UCC") for buyers who accept nonconforming goods. [Filing No. 97 at 5.] Plaintiffs respond that Indiana law permits them to bring a breach of contract claim under the circumstances alleged here, because they revoked their acceptance of a non-conforming shipment as part of an instalment contract. [Filing No. 105 at 3.]

The Court addresses this argument succinctly, because resolution of the breach of contract claim turns on factual issues and calls for consideration of materials outside of the pleadings. In order to determine whether Plaintiffs may successfully raise a breach of contract claim, the following questions, among others, are at issue: whether the parties understood the relevant contract(s) to be instalment contracts; whether Plaintiffs made an effective rejection or revocation of the allegedly nonconforming goods; whether Sensient's conduct justified any initial acceptance; and when Plaintiffs discovered or should have discovered the alleged defect. *See Integrity Bio-Fuels, LLC v. Musket Corp.,* 2015 WL 1417849, at *19 (S.D. Ind. 2015); *see also* I.C. § 26-1-2-608; I.C. § 26-1-2-714. These fact-dependent issues are appropriate for resolution at a later stage, either by summary judgment or by a finder of fact.

The Court therefore denies Sensient's motion to dismiss the breach of contract claim.

*4. Indiana Products Liability Act*

Sensient also moves to dismiss Plaintiffs' claim under the IPLA. That statute provides an alternative remedy to those supplied by the UCC. *See B&B Paint Corp. v. Shrock Mfg., Inc.,* 568 N.E.2d 1017, 1021 (Ind. Ct. App. 1991). The IPLA applies to all actions brought by a user or consumer against a manufacturer or seller for physical harm caused by a product, regardless of the legal theory upon which the action is brought. *See* I.C. § 34-20-1-1. The IPLA provides that:

> …a person who sells, leases, or otherwise puts into the stream of commerce any product in a defective condition unreasonably dangerous to any user or consumer or to the user's or consumer's property is subject to liability for physical harm caused by that product to the user or consumer or to the user's or consumer's property if:
>
> (1) that user or consumer is in the class of persons that the seller should reasonably foresee as being subject to the harm caused by the defective condition;
>
> (2) the seller is engaged in the business of selling the product; and

(3) the product is expected to and does reach the user or consumer without substantial alteration in the condition in which the product is sold by the person sought to be held liable under this article.

I.C. §34-20-2-1. "'Physical harm,' for purposes of [I.C. §34-20-2-1], means bodily injury, death, loss of services, and rights arising from any such injuries, as well as sudden, major damage to property. … The term does not include gradually evolving damage to property or economic losses from such damage." I.C. § 34-6-2-105.

The Supreme Court of Indiana has thoroughly considered the scope of the IPLA, particularly as it relates to remedies sought under that statute versus under contract law. *See, e.g., Indianapolis-Marion County Public Library v. Charlier Clark & Linard, P.C.*, 929 N.E.2d 272 (Ind. 2010); *Gunkel v. Renovations, Inc.*, 822 N.E.2d 150 (Ind. 2005). As relevant here, the Indiana Supreme Court has repeatedly clarified that a defendant is not liable under the IPLA "for any purely economic loss caused by its negligence (including, in the case of a defective product or service, damage to the product or service itself)." *Public Library,* 929 N.E.2d at 726-27. "This rule precluding [IPLA] liability for purely economic loss—that is, pecuniary loss unaccompanied by any property damage or personal injury (other than damage to the product or service itself)— has become known as the 'economic loss rule.'" *Id.* at 727. But the defendant "is liable under [the IPLA] if the defect causes personal injury or damage to property *other than the product* or service itself." *Gunkel,* 822 N.E.2d at 153 (emphasis added) ("In sum, Indiana law under the Products Liability Act and under general negligence law is that damage from a defective product or service may be recoverable under a tort theory if the defect causes personal injury or damage to other property, but contract law governs damage to the product or service itself and purely economic loss arising from the failure of the product or service to perform as expected.").

Sensient moves to dismiss Plaintiffs' IPLA claim, contending that Plaintiffs only allege damage to the product itself, with the relevant product defined as the seed treatment mixtures. [Filing No. 97 at 8.] Therefore, Sensient argues, Plaintiffs cannot meet the "other property" rule embedded within the economic loss doctrine. [Filing No. 97 at 8.] Citing a Supreme Court of South Dakota case and the Third Restatement of Torts, Sensient argues that "each finished seed treatment blend sold by Plaintiffs were an integrated whole. Damage to the blend is per se damage to the blend's components and does not constitute 'other property.'" [Filing No. 97 at 9.]

Indiana authority speaks decisively to this issue, and the Court need not look to South Dakota state law. The Supreme Court of Indiana defines "other property" in the following manner:

> property acquired separately from the defective good or service is 'other property,' whether or not it is, or is intended to be, incorporated into the same physical object. Although we express our reasoning slightly differently, we align ourselves with the courts that have concluded that the 'product' is the *product purchased by the plaintiff*, not the product furnished by the defendant.

*Gunkel*, 822 N.E.2d at 155 (emphasis added). Phrased slightly differently, "property acquired separately [is] 'other property' for purposes of the economic loss rule even if the defective product is to be incorporated into a completed product for use or resale." *Id.* at 156.

Here, the products purchased by Plaintiffs are Sensient's colorants and polymers—not the finished seed treatments. Plaintiffs allege that they purchased colorants and polymers from Sensient with the intention that Sensient's products would be blended with other ingredients, such as fungicides and pesticides. [Filing No. 95 at 4.] As alleged, those ingredients were acquired separately from Sensient's polymers and colorants, and they were all incorporated into a completed product for sale to end-user customers. [Filing No. 95 at 4.] This fits squarely within the definition of "other property" under Indiana law.

Sensient contends in reply that a decision by this Court establishes that the rule announced in *Gunkel* does not apply when "mixed ingredients" are involved. [Filing No. 109 at 8 (citing

*Elanco Animal Health, a Div. of Eli Lilly & Co. v. Archer Daniels Midland Co. Animal Health & Nutrition Div.*, 2008 WL 4099881, at \*2 (S.D. Ind. 2008)).] That case, however, does not establish a "mixture" rule, as proposed by Sensient.

In that case, plaintiff Eli Lilly entered into a processing agreement with defendant ADM to produce an animal feed additive called Tylan 40. *Id.* at \*1. Pursuant to the agreement, Lilly shipped ADM the active ingredient, known as GTC, and ADM was responsible for procuring all of the inactive ingredients for Tylan 40. *Id.* ADM then mixed all of the component ingredients. *Id.* Lilly did not pay ADM for the individual components—it paid instead for the finished Tylan 40. *Id.* at \*2. Lilly brought suit against ADM, alleging that ADM procured a contaminated inactive ingredient (rice hulls) and mixed that ingredient into a batch of Tylan 40. *Id.* at \*2. Lilly argued that the contaminated rice hulls were the defective product and that the "other property" damaged was the GTC that ADM mixed with them. *Id.* This Court concluded that under those circumstances—where the product Lilly purchased was the finished Tylan 40—*Gunkel*'s rule dictated that the damage, then, was to the product itself. *Elanco*, 2008 WL 4099881, at \*3. As such, no "other property" was involved, and the economic loss rule barred Lilly from asserting a claim under the IPLA. *Id.* Here, unlike in *Elanco*, Sensient provided, and Plaintiffs paid Sensient for only the colorant. Also unlike *Elanco*, Plaintiffs purchased that single ingredient and mixed it themselves with other ingredients, acquired separately, to form the seed treatments. As *Gunkel* made clear, "the 'product' is the item purchased by the plaintiff," and in this case, that product was the colorant. *Gunkel*, 822 N.E.2d at 155. Therefore, the other ingredients constituted "other property" for purposes of the economic loss rule.

Sensient also argues that Plaintiffs have failed to adequately plead that Sensient's products caused "sudden, major" damage to the finished seed treatments, as required under the IPLA.

[Filing No. 97 at 9-10.]  Sensient contends that Plaintiffs have pleaded that the damage occurred slowly, as the blends were made in December 2012, and the treatments "began to show a thick sludge" in the spring of 2013.  [Filing No. 97 at 10.]  The Court does not read Plaintiffs' Third Amended Complaint as alleging that the sludge developed slowly, but instead as alleging that Plaintiffs and their customers *discovered* the sludge in the spring of 2013, when they began to treat seeds for planting.  It would not be unusual for Plaintiffs or their customers to first discover an issue with the seed treatments in the spring, given the seasonal nature of the product's use.  This pleading is sufficient to state a claim under the IPLA.  *See Paper Mfrs. Co. v. Rescuers, Inc.*, 60 F. Supp. 2d 869, 878 (N.D. Ind. 1999) (where party discovered contamination several months after delivery).[3]

For the reasons above, the Court denies Sensient's motion to dismiss Plaintiffs' claims under the IPLA.

*5. Claims Raised by DEI*

Sensient moves to dismiss all claims raised against it by DEI, arguing that DEI is neither a party nor a third-party beneficiary to the relevant contracts.  [Filing No. 97 at 15.]  Plaintiffs respond that DEI is a direct contracting party, or, in the alternative, that DEI is a third-party beneficiary of the purchase orders.  [Filing No. 105 at 11.]

"Those not a party to a contract may enforce the contract if they show that they are third party beneficiaries."  *R.R. Donnelley & Sons Co. v. N. Texas Steel Co.*, 752 N.E.2d 112, 122 (Ind. Ct. App. 2001).  Under Indiana law:

---

[3] The Court notes as well that when and how any alleged property damage occurred is "an issue of fact that requires such weighing, balancing and assessing the underlying facts," *Paper Mfrs.*, 60 F.Supp.2d at 878, which the Court may not do at the motion to dismiss or other dispositive motion stage.

[a] third party beneficiary contract exists when (1) the parties intend to benefit a third party; (2) the contract imposes a duty on one of the parties in favor of the third party; and (3) the performance of the terms of the contract render a direct benefit to the third party intended by the parties to the contract. The intent of the parties to benefit the third party is the controlling factor and this may be shown by naming the third party or by other evidence.

*Id.* Whether the parties intended to benefit a third party is a fact-intensive question that is not suited for resolution on a motion to dismiss, and the Court concludes that Plaintiffs have plausibly pleaded that they are third-party beneficiaries to the relevant contracts. Plaintiffs have pleaded, for example, that prior to the purchase orders at issue, Mr. Brewer "was informed of the creation of Olympus and that Olympus would make the blends and sell the treatments to DEI and DEI's customers;" that "Brewer regarded DEI and Olympus as a single customer and with the express understanding that DEI would be the primary beneficiary of the treatment blends made by Olympus;" that Olympus paid for Sensient's products via a joint account with DEI; and that Mr. Brewer stated that "'Sensient will be a key colorant supplier to Direct Enterprises,' and confirmed on numerous occasions that Sensient had a direct relationship with DEI." [Filing No. 95 at 7.]

Sensient also argues that, under the UCC, only natural persons, and not corporations, can qualify as third-party beneficiaries. [Filing No. 97 at 15.] Sensient provides no support for this proposition, and Indiana cases recognize non-natural persons as third-party beneficiaries. *See, e.g., Barth Electric Co. v. Traylor Bros. Inc.,* 553 N.E.2d 504 (Ind. Ct. App. 1990) (concluding Barth Electric Co. was third-party beneficiary to contract).

The Court therefore denies Sensient's motion to dismiss DEI as a plaintiff.

**B. Spectra's Motion to Dismiss**

The Court now turns to Spectra's Motion to Dismiss, [Filing No. 100]. Spectra has filed a motion to dismiss Plaintiffs' claim against it, raising the affirmative defense that Plaintiffs' claim

is time-barred by the applicable statute of limitations.[4]  [Filing No. 101.]  Plaintiffs respond that the claim is not time-barred, both because the claim relates back to date that the first Complaint was filed, and because the IPLA statute of limitations was tolled by Sensient's and Spectra's concealment of material facts.  [Filing No. 106 at 4.]  Plaintiffs also argue that even if the statute of limitations would otherwise apply to bar their claim, Spectra engaged in dilatory tactics that equitably estop them from raising a statute-of-limitations defense.  [Filing No. 106 at 6.]

The Court notes at the outset that generally, at the motion to dismiss stage, consideration of a statute-of-limitations affirmative defense is inappropriate.  Because a plaintiff need not anticipate or allege facts that would defeat affirmative defenses, a court typically cannot dismiss a complaint for failure to satisfy a statute of limitations until summary judgment.  *Barry Aviation, Inc. v. Land O'Lakes Mun. Airport Comm'n,* 377 F.3d 682, 688 (7th Cir. 2004).  However, a court may properly rule on an affirmative defense where the complaint includes all of the information necessary to do so.  *Id.*  Therefore, where "the relevant dates are set forth unambiguously in the complaint," a court may reach a statute of limitations argument on a motion to dismiss.  *Brooks v. Ross,* 578 F.3d 574, 579 (7th Cir. 2009).

The parties agree that the IPLA requires a plaintiff to bring a cause of action for product liability within two years after the cause of action accrues.  I.C. §34-20-3-1.  A cause of action "accrues" when the plaintiff "knew or should have discovered that she suffered an injury or impingement, and that it was caused by the product or act of another."  *Nelson v. Sandoz Pharms. Corp.*, 288 F.3d 954, 966 (7th Cir. 2002).

The Court summarizes as follows the relevant dates for purposes of the statute-of-limitations analysis.  As alleged by Plaintiffs, in the spring of 2013, Plaintiffs began to notice the

---

[4] Spectra does not move to dismiss Sensient's third-party claims against it.

sludge and gas accumulation issues with the seed treatment blends, and they promptly notified Sensient of the issues. [Filing No. 95 at 11.] On October 22, 2013, Sensient informed Plaintiffs that a batch of Red Pearl colorant they received was overloaded with ammonium hydroxide. [Filing No. 95 at 12.] On April 29, 2014, Sensient informed Plaintiffs that Spectra was actually the manufacturer of Sensient's colorants. [Filing No. 95 at 13.] On August 24 and September 5, 2015, respectively, Plaintiffs filed their initial and First Amended Complaints. [Filing No. 1; Filing No. 9.] Neither of those complaints named Spectra as a defendant. On December 19, 2015, Plaintiffs filed their Second Amended Complaint, which did not name Spectra as a defendant. [Filing No. 23.] On January 13, 2017, Plaintiffs sought leave to file their Third Amended Complaint, [Filing No. 82], and on February 18, 2017, Plaintiffs filed their Third Amended Complaint, naming Spectra as a defendant, [Filing No. 95].

*1. Federal Rule of Civil Procedure 15 and Relation Back*

Before addressing Spectra's arguments as to when Plaintiffs' claim accrued, the Court first addresses Plaintiffs' contention that the Third Amended Complaint relates back to the filing date of the initial complaint. Plaintiffs argue that "Rule 15 allows pleadings amendments to relate back to the date of original filing when they arise out of the same transaction or occurrence set out in the original pleading." [Filing No. 106 at 3.] As such, Plaintiffs argue, the Third Amended Complaint relates back to the August 24, 2015 filing (which no one contends was untimely). [Filing No. 106 at 3.] Spectra responds that Plaintiffs address only one of the requirements for relation-back—the portion covered by Rule 15(c)(1)(B)—but not the requirements of Rule 15(c)(1)(C), which also apply. [Filing No. 116 at 2.]

Federal Rule of Civil Procedure 15(c)(1)(C) governs amendments to pleadings that change the party against whom a claim is asserted. It provides that an amendment to a pleading relates back to the date of the original pleading when:

> (C) the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment:
>> (i) received such notice of the action that it will not be prejudiced in defending on the merits; and
>> (ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.

F.R.C.P. 15(c)(1)(C).[5] The Seventh Circuit has interpreted this rule to permit an amendment to relate back to the original complaint "only where there has been an error made concerning the identity of the proper party and where that party is chargeable with knowledge of the mistake." *King v. One Unknown Federal Correctional Officer,* 201 F.3d 910, 914 (7th Cir. 2000) (citations omitted). Here, no error was made concerning the identity of the proper party, and Plaintiffs did not mistakenly sue the wrong party. Instead, Plaintiffs failed to name an additional party, Spectra, which may have shared in liability for the allegedly offending conduct. This does not satisfy Rule 15(c)(1)(C)(ii). *See Penn v. Chicago State Univ.*, 162 F. Supp. 2d 968, 974 (N.D. Ill. 2001), *aff'd sub nom. Penn v. Harris*, 296 F.3d 573 (7th Cir. 2002) ("When plaintiffs fail to sue the correct party because they lack knowledge of the identity of the proper party, they fail to satisfy the requirements of Rule 15(c) and an amendment naming the correct party does not relate back to the filing of the original complaint. ... [Plaintiff] did not mistakenly sue the wrong party; he simply did not know the identity of the correct party.").

---

[5] Both parties agree that the requirements of Rule 15(c)(1)(B) are satisfied—namely that the claims in the Third Amended Complaint arise out of the same transaction or occurrence as that set out in the initial pleading.

Therefore, the Court concludes that the Third Amended Complaint does not relate back to the August 24, 2015 initial Complaint filing.

*2. Accrual Date*

Because Plaintiffs' Third Amended Complaint does not relate back to the initial filing, the key issue is the date on which Plaintiffs' claim accrued against Spectra. Spectra identifies two possible accrual dates and argues that, regardless of which one applies, Plaintiffs' claims are outside of the statute-of-limitations period. Spectra first suggests that October 22, 2013 is the proper accrual date, because on that date Sensient informed Plaintiffs that a batch of Red Pearl colorant they received was overloaded with ammonium hydroxide. [Filing No. 101 at 4 (citing Filing No. 95 at 12).] However, as Plaintiffs point out, they allege that they were not made aware that Spectra was the actual manufacturer of the colorants until several months later, so they could not have known that Spectra was a proper defendant. Ultimately, the Court need not determine whether this is the proper accrual date, because as described below, even a later plausible accrual date renders the Third Amended Complaint outside the statute-of-limitations period.

Spectra argues that, at the latest, Plaintiffs would have been aware that Spectra was a proper defendant on April 29, 2014, when Sensient informed them that Spectra was the actual manufacturer of the colorants. [Filing No. 116 at 4.] Plaintiffs do not specifically respond as to whether April 29, 2014 is the proper accrual date, and the Court concludes that it is. First, Plaintiffs allege in their Third Amended Complaint that during the course of investigating consumer complaints sometime during or after the spring of 2013, they came to believe that Sensient's colorants were causing the problems observed in the seed treatment blends. [Filing No. 95 at 11.] On October 22, 2013, Sensient informed Plaintiffs that one batch of colorants was "ten-times overloaded" with ammonium hydroxide. [Filing No. 95 at 12.] And on April 29, 2014, Sensient

informed Plaintiffs that Spectra was the actual manufacturer of the colorants. [Filing No. 95 at 13.] Taking these allegations as true, the Court concludes that as of April 29, 2014, Plaintiffs knew that they had suffered an injury, and that the injury could have been caused by Spectra's product. *See Nelson*, 288 F.3d at 966. Therefore, any complaint against them should have been filed by April 29, 2016.

Plaintiffs argue that, for two reasons, their claim against Spectra nonetheless is not barred by the statute of limitations. First, Plaintiffs contend that Sensient and Spectra actively concealed Spectra's identity, and that as such, the statute of limitations was tolled. [Filing No. 106 at 5.] Plaintiffs also argue that the letter disclosing Spectra's involvement in manufacturing the colorant did not identify the company with sufficient specificity. [Filing No. 106 at 5.] Plaintiffs allege that at least three companies bear the name Spectra, and rather than potentially sue innocent parties, Plaintiffs "pursued the prudent course of filing its lawsuit against Sensient with the aim of developing better information through discovery." [Filing No. 106 at 5.]

"In Indiana, the doctrine of fraudulent concealment is available to estop a defendant from asserting the statute of limitations when the defendant has, either by deception or by violating a duty, concealed from the plaintiff material facts, preventing the plaintiff from discovering a potential cause of action." *Logan v. Wilkins*, 644 F.3d 577, 582 (7th Cir. 2011) (citing *City of E. Chi. v. E. Chi. Second Century, Inc.,* 908 N.E.2d 611, 621-22 (Ind. 2009)). "To successfully invoke fraudulent concealment and toll the statute of limitations, a plaintiff must establish that the concealment or fraud was of such character to prevent inquiry, elude investigation, or to mislead the plaintiff." *Logan,* 644 F. 3d at 582 (citing *Doe v. Shults-Lewis,* 718 N.E.2d 738, 748 (Ind. 1999)).

The Court concludes that Plaintiffs cannot avail themselves of the doctrine of fraudulent concealment here. First, Plaintiffs do not allege in their Third Amended Complaint that Spectra concealed or attempted to conceal its identity as the manufacturer of the colorants. The Seventh Circuit has concluded that if the facts pleaded in the complaint establish that a claim is time barred … a bare allegation of fraudulent concealment, without more, will not save the claim." *Logan,* 644 F.3d at 582-83.

Second, even if Plaintiffs had pleaded allegations of concealment, it is undisputed that Plaintiffs discovered the "concealed" facts by April 29, 2014—namely, that Spectra manufactured the colorants. Under the doctrine of fraudulent concealment, equity tolls the statute of limitations "until the equitable grounds cease to operate as a reason for delay." *Shults-Lewis,* 718 N.E.2d at 745. "[T]he fraudulent concealment exception does not establish a new date for the commencement of the statute of limitations, but rather creates an equitable exception … instead of a full statutory limitations period within which to act, a plaintiff must exercise due diligence in commencing [his] action after the equitable grounds cease to operate as a valid basis for causing delay." *Fager v. Hundt,* 610 N.E.2d 246, 251 (Ind. 1993) (citations omitted). Here, once Plaintiffs discovered the identity of the manufacturer, the equitable grounds ceased to operate as a valid basis for delay.

Plaintiffs argue that they nonetheless had a valid basis for delay. They contend that Sensient's letter identifying Spectra as the manufacturer was "sparse on details regarding Spectra," and that at least three colorant companies share that name. [Filing No. 106 at 5.] Plaintiffs argue that "[r]ather than go off half-cocked, and incur the extra expense of suing innocent parties, Plaintiffs pursued the prudent course of filing its [sic] lawsuit against Sensient with the aim of developing better information through discovery." [Filing No. 106 at 5.] Plaintiffs' attempts to

economize in litigation, however laudable, do not constitute a continuing concealment on the part of Spectra. Plaintiffs do not allege that Sensient or Spectra attempted to hide which of the three Spectra entities was involved. Plaintiffs do not claim that they conducted any investigation on their own as to who the proper party was—including contacting for clarification either Sensient or any of the Spectra entities. The Court concludes that, even if there were fraudulent concealment (which has not been pleaded by Plaintiffs), that concealment ceased to operate as a basis for delay on April 29, 2014, when Plaintiffs learned that Spectra was the manufacturer of Sensient's colorants.

Finally, Plaintiffs argue that, even aside from any fraudulent concealment, Spectra should be equitably estopped from pursuing a statute of limitations defense because Spectra engaged "dilatory tactics" in responding to discovery. [Filing No. 106 at 6.] Spectra's tactics in discovery, however dilatory they may have been, have no impact on the statute-of-limitations issue. By Plaintiffs' allegations, they were aware as of April 29, 2014 that Spectra manufactured Sensient's colorants. On that date they "knew or should have discovered that [they had] suffered an injury or impingement, and that it was caused by the product or act of another." *Nelson*, 288 F.3d at 966. Plaintiffs were not required to articulate Spectra's precise actions or degree of involvement in order to determine whether a suit against Spectra was proper. As the Indiana Court of Appeals has articulated:

> The application of the discovery rule does not mandate that plaintiffs know with precision the legal injury that has been suffered, but merely anticipates that a plaintiff be possessed of sufficient information to cause him to inquire further in order to determine whether a legal wrong has occurred. … Stated more succinctly, the law does not require a smoking gun in order for the statute of limitations to commence.

*Perryman v. Motorist Mut. Ins. Co.*, 846 N.E.2d 683, 689 (Ind. Ct. App. 2006). Spectra's actions during discovery simply have no bearing on the statute of limitations issue.

For the reasons stated above, the Court concludes that Plaintiffs' cause of action against Spectra accrued by (at the latest) April 29, 2014, requiring them to file suit against Spectra by April 29, 2016 to fall within the applicable two-year statute of limitations. Because Plaintiffs failed to do so, and because no equitable exception applies, the Court concludes that Plaintiffs' claim against Spectra is time-barred. The Court therefore grants Spectra's Motion to Dismiss, [Filing No. 100].

## IV.
### CONCLUSION

For the foregoing reasons, the Court **DENIES** Sensient's Motion to Dismiss, [Filing No. 96], and **GRANTS** Spectra's Motion to Dismiss, [Filing No. 100].

Date: 8/3/2017

Date: _August 3, 2017_

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

Distribution:

Joel E. Cape
CAPE LAW FIRM PLC
joel@jcapelaw.com

Kathleen Ann DeLaney
DELANEY & DELANEY LLC
kathleen@delaneylaw.net

Kori Flake
KOPKA PINKUS DOLIN PC
keflake@kopkalaw.com

Jason Levin
STEPTOE & JOHNSON LLP
jlevin@steptoe.com

Kelly D.H. Lowry
THE LAW OFFICES OF KELLY D.H. LOWRY, P.C.
kelly@kellydhlowry.com

Eric C. McNamar
LEWIS WAGNER LLP
emcnamar@lewiswagner.com

Leslie B. Pollie
KOPKA PINKUS DOLIN PC
lbpollie@kopkalaw.com

Christopher S. Stake
DELANEY & DELANEY LLC
cstake@delaneylaw.net

Libretta P. Stennes
STEPTOE & JOHNSON LLP
lstennes@steptoe.com

John Carl Trimble
LEWIS WAGNER LLP
jtrimble@lewiswagner.com